UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

NATHAN C. THOMAS                                                    PLAINTIFF

v.                                              CIVIL ACTION NO. 3:16-CV-00659-DW

NANCY A. BERRYHILL,
Acting Commissioner of Social Security                              DEFENDANT

## MEMORANDUM OPINION
## AND ORDER

Plaintiff Nathan C. Thomas has filed a complaint pursuant to 42 U.S.C. §405(g) to obtain

judicial review of a final decision of the Commissioner of Social Security that, while partially

favorable to his applications for disability insurance benefits (DIB) and supplemental security

income (SSI), rejected his alleged onset date of August 15, 2011 in favor of the significantly later

date, May 1, 2015.  Thomas applied for DIB and SSI on August 29, 2013, alleging that he was

disabled as of August 15, 2011, due to heart problems and dyslexia (Tr.73, 193, 201).  The

Commissioner denied Thomas's claims on initial consideration (Tr. 67-92) and on

reconsideration (Tr. 97-124).  Thomas requested a hearing before an Administrative Law Judge

(ALJ) (Tr. 149, 150-56).

ALJ William C. Zuber conducted a hearing in Louisville, Kentucky, on June 2, 2015 (Tr.

32-64).  Thomas attended with his attorney, Trevor Smith (Tr. 32).  Thomas and vocational

expert (VE) Robert Piper testified at the hearing (Tr. 37-59, 60-66).  Following the conclusion of

the hearing, ALJ Zuber entered a hearing decision on August 21, 2015 that found Thomas was

disabled for the purposes of the Social Security Act as of May 1, 2015 (Tr. 18-26).

In his adverse decision, ALJ Zuber made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.      The claimant has not engaged in substantial gainful activity since the alleged onset date (20 C.F.R. 404.1571, *et seq.* and 416.971, *et seq.*).

3.      Since the alleged onset date of disability, August 15, 2011, the claimant has had the following severe impairments:  chronic atrial fibrillation, hypertension, and learning disability (20 C.F.R. 404.1520(c) and 416.920(c)).

4.      Since the alleged onset date of disability, August 15, 2011, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that since August 15, 2011, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that that [sic] he could only occasionally climb ramps and stairs. He could frequently stoop, crouch, crawl, and kneel. He could never climb ladders, ropes, and scaffolds. He cannot be exposed to dangerous machinery, unprotected heights, vibration or temperature extremes. He could do no more than occasional simple reading and writing.

6.      Since August 15, 2011, the claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7.      Prior to the established disability onset date, the claimant was an individual closely approaching advanced age. Applying the age categories non-mechanically, and consideration the additional adversities in this case, on May 1, 2015, the claimant's age category changed to an individual of advanced age. (20 C.F.R. 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9.      Prior to May 1, 2015, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.  Beginning on May 1, 2015, the claimant has not been able to transfer job skills to other occupations (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, App. 2).

10.     Prior to May 1, 2015, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. 404.1569, 404.1569(a), 416.969 and 416.969(a)).

11.     Beginning on May 1, 2015, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 CRF 404.1560(c), 404.1566, 416.960(c), and 416.966).

12.     The claimant was not disabled prior to May 1, 2015 but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(g) and 416.921(g))

(Tr. 20-26).  Thomas sought review of the hearing decision by the Appeals Council (Tr. 11-13). The Appeals Council denied his request for review, finding no reason under the Rules to review ALJ Zuber's decision (Tr.1-6).  The present lawsuit followed.


**The Five-Step Sequential Evaluation Process.**

Disability is defined by law as being the inability to do substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  See, 20 CFR §§ 404.1505, 416.905(a).  To determine whether a claimant for DIB or SSI benefits satisfies such definition, a 5-step evaluation process has been developed.  20 CFR §§ 404.1520, 916.920(a).  At step 1, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the Commissioner will find the claimant to be not disabled.  See, 20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(ii), 416.971.  *See, Dinkel v. Secretary*, 910 F2d, 315, 318 (6th Cir. 1990).

If the claimant is not working, then the Commissioner next must determine at step 2 of the evaluation process whether the claimant has a severe impairment or combination of severe impairments that significantly limit his or her ability to perform basic work activities.  See 20 CFR §§ 404.1520(a)(4)(ii),  416.920(a)(4)(ii).  If the impairments of the claimant are determined by the Commissioner to be non-severe, in other words, so slight that they could not result in a finding of disability irrespective of a claimant's vocational factors, then the claimant will be determined to be not disabled at step 2.  *See, Higgs v. Bowen*, 880 F.2d 960, 962 (6th Cir. 1988); *Mowery v. Heckler*, 771 F.2d 966, 971-72 (6th Cir. 1985).

If the claimant has a severe impairment or impairments, then the Commissioner at step 3 of the process will determine whether such impairments are sufficiently serious to satisfy the listing of impairments found in Appendix 1 of Subpart P of Part 404 of the federal regulations. 20 CFR §§ 404.1520(A)(4)(iii), 416.920(a)(4)(iii) The claimant will be determined to be automatically disabled without consideration of his or her age, education or work experience if the claimant's impairments are sufficiently severe to meet or equal the criteria of any impairment listed in the Appendix.  *See*, *Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

When the severity of the claimant's impairments does not meet or equal the listings, then the Commissioner must determine at step 4 whether the claimant retains the residual functional capacity (RFC) given his or her impairments to permit a return to any of his or her past relevant work.  20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  *See, Smith v. Secretary*, 893 F.2d 106, 109-110 (6th Cir. 1989).  A claimant who retains the residual functional capacity, despite his or her severe impairments, to perform past relevant work is not disabled. 20 CFR §§ 404.1560(b)(3), 416.960(b)(3)  The burden switches to the Commissioner at step 5 of the

4

sequential evaluation process to establish that the claimant, who cannot return to his or her past relevant work, remains capable of performing alternative work in the national economy given his or her residual functional capacity, age, education and past relevant work experience.  See, 20 CFR §§ 404.1520(a)(4)(v), 404.1560( c ), 416.920(a)(4)(v), 416.960( c ); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994); *Herr v. Commissioner*, 203 F.3d 388, 391 (6th Cir. 1999). Collectively, the above disability evaluation analysis is commonly referred to as the "5-step sequential evaluation process."

**Standard of Review.**

Review of a decision of the Commissioner is governed by 42 U.S.C. § 405(g).  The statute, and case law that interprets it, require a reviewing court to affirm the findings of the Commissioner if they are supported by substantial evidence and the Commissioner has employed the appropriate legal standard.  *Walters v. Commissioner of Social Security*, 127 F.3d 525, 528 (6th Cir. 1997) ("This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.).  Substantial evidence is defined by the Supreme Court to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  *See also, Lashley v. Sec'y of HHS*, 708 F.2d 1048, 1053 (6th Cir. 1983) (citing *Perales*).  It is more than a mere scintilla of evidence or evidence that merely creates the suspicion of the existence of a fact, but must be enough evidence to justify a refusal to direct a verdict if the matter were tried to a jury. *Sias v. Sec'y of HHS*, 861 F.2d 475, 479 n. 1 (6th Cir. 1988).

5

The substantiality of the evidence is to be determined based upon a review of the record taken as a whole, not simply some evidence, but rather the entirety of the record to include those portions that detract from its weight.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Laskowski v. Apfel*, 100 F. Supp.2d 474, 482 (E.D. Mich. 2000).  So long as the decision of the Commissioner is supported by substantial evidence, it must be upheld by the federal court even if the record might support a contrary conclusion.  *Smith v. Sec'y of HHS*, 893 F.2d 106, 108 (6th Cir. 1989).  The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts."  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).

**Issues for Review.**

Nathan Thomas is a 56 year-old, divorced, former forklift operator with a 10th grade education and a documented medical history of heart and learning problems.  (TR 38-39, 193-194, 400-401).  Thomas seeks judicial review of the decision of the Commissioner, a partially-favorable decision, that found him to be disabled as of May 1, 2015 pursuant to Medical-Vocational Rule 202.02.  (TR 26).  The Commissioner, however, rejected Thomas's claim that he became disabled nearly four years earlier on August 15, 2011 based on the determination that Thomas retained the residual functional capacity (RFC) to do a restricted range of light work that permitted him to perform such alternative jobs as hand packager, sorter or assembler prior to May 1, 2015.  (TR 21-24, 60-61).

Thomas in his Fact and Law Summary objects to findings of fact Nos. 3, 4, 9, 10, 11 and 12 of ALJ Zuber's hearing decision (TR 18-26).  The ALJ determined in finding no. 3 that

Thomas has severe impairments of chronic atrial fibrillation, hypertension and a learning disability.  Thomas first argues that the ALJ without explanation failed to include among his severe impairments congestive heart failure (CHF).  Thomas explains that he was first diagnosed with CHF during his hospitalization from October 30-to-November 5, 2012.  (TR 329).  Again in March 2014, following another hospital admission for shortness of breath and fatigue, Thomas received a secondary diagnosis of CHF, a diagnosis that Thomas maintains continued throughout the entire period from November 2012 through 2015.  Yet, the hearing decision of ALJ Zuber makes virtually no mention of the CHF diagnosis according to Thomas.

Thomas next argues that the ALJ failed at step 3 of the sequential evaluation process to determine in finding of fact no. 4 whether his CHF met the requirements of Listing 4.02, or whether his CHF in combination with his atrial fibrillation satisfied the criteria of Listing 4.05. Thomas insists that this oversight cannot be considered harmless as medical evidence of record establishes that he met or equaled a listing under Listing 4.0.  Specifically, Thomas points to his documented abnormal electrocardiogram results (TR 513-514), his testimony on the limitations of his activities of daily living (TR 38, 45, 47-49) his heart medication history (TR 395, 402, 477) and his New York Heart Association II/III classification (NYHA) (TR 422), as compelling proof that his signs, symptoms and laboratory findings, when fully considered, satisfy all of the requirements of the above Listings.  Thomas insists that this oversight at step three is reversible error given that ALJ Zuber was required by the express language of 42 U.S.C. § 405(b)(1) to explain the unfavorable hearing decision in "understandable language" with a "discussion of the evidence" thereby creating an enforceable right in Thomas to have *all* of the evidence of record considered.

7

Thomas also takes issue with the RFC determination contained in finding no 5 of the hearing decision (TR 21-24).  As earlier noted, the ALJ found that Thomas remained capable after August 15, 2011, despite the limitations imposed by his impairments, to perform a limited range of light work until May 1, 2015, when Thomas's age category under the regulations changed from one of an "individual closely approaching advanced age" to an "individual of advanced age."  (TR 21).  Thomas complains that the ALJ in his adverse credibility determination at page 5 of his hearing decision (TR 23) failed to take into account Thomas's 32 year long work history and his life-long absence of drug, alcohol or cigarette abuse.

Thomas continues to argue that the ALJ misread the medical records related to his October 2012 hospital admission to focus primarily on the possibility of pneumonia while omitting the CHF diagnosis of the treating cardiologist Dr.  Ponnatra Cherian on final discharge, a diagnosis supported by echocardiogram and EKG testing that explained Thomas's shortness of breath, fatigue and dizziness.  (TR 329, 334).  Thomas similarly claims that the ALJ erred in his interpretation of the clinical findings based merely on various comments by Thomas that he was "doing well" and had no reported symptoms, despite repeated, unsuccessful cardioversions along with an adverse medical source opinion from Thomas's treating cardiologist, Dr.  Cherian, which imposed multiple, work-related physical limitations that clearly precluded all substantial gainful activity as of the alleged onset date.  (TR 559-561).

Yet, the ALJ according to Thomas merely gave some weight to Dr. Cherian's medical source statement of ability to do work-related activities based on the erroneous belief that the doctor had only examined Thomas on three occasions in the spring of 2015, when in fact the doctor was the treating cardiologist at the time of Thomas's initial hospital admission on October 30, 2012 (TR 24, 327-338).  Thomas consequently argues that the evaluation of the opinion of

8

his treating cardiologist by the ALJ is contrary to the requirements of 20 CFR § 404.1527(c) and

is not supported by substantial evidence where Dr. Cherian's opinion is well-supported by the

NYHA classification, the 2012 hospitalization records and repeated, unsuccessful cardioversion

results as interpreted by Dr. Schwartz.  (TR 540-542, 560-561).

## Legal Analysis

**Finding of Fact No. 3**

Thomas is correct that ALJ Zuber failed to include among the severe impairments his

CHF condition.  Step 2 and its requirement of a severe impairment exist to eliminate those

claims that involve at most a slight abnormality that has no significant effect on the ability of a

claimant to perform work. *See, Rogers v. Comm'r*, 486 F.3d 234, n.2 (6th Cir. 2007)(" The

severity regulation at step 2 of the sequential evaluation process is considered in this circuit to be

a "de minimis hurdle."); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988); *Farris v. Sec'y*, 773

F.2d 85, 89-90 (6th Cir. 1985) (Step 2 of the evaluation process is an administrative convenience

for screening out totally groundless claims).

By regulation a "severe" impairment is one that significantly limits the ability of a

claimant to do basic work activities, which include the ability and aptitude necessary to do most

jobs.  See 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(c), 416.921(b).  Thomas bears the burden to

demonstrate at step 2 of the evaluation process that he suffers from medically determinable

physical impairments based on medical science and laboratory findings that significantly limits

his ability to do basic work activities.  *See, Watters v. Comm'r*, 2013 WL 3722099 at *2 (6th Cir.

July 17, 2013) (citing SSR 96-4p, 1996 WL 374187 at*1).

The failure of the Commissioner to find a particular impairment to be severe, contrary to

the cited regulations and decisions, may nonetheless constitute harmless error.  *See, Maziriaz v.*

9

*Sec'y of HHS*, 837 F.2d 240, 244 (6th Cir. 1987).  The Commissioner is required by regulation to consider all of a claimant's impairments, both the severe and non-severe, when determining the residual functional capacity (RFC) of the claimant.  See 20 C.F.R. §416.945 ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§404.1520(c), 404.1521 and 404.1523, when we assess your residual functional capacity."); 20 C.F.R.§416.923 (the combined effects of severe and non-severe impairments will be considered throughout the disability process without regard to whether any impairment would be sufficiently severe itself to establish disability).

So long as ALJ Zuber in his hearing decision continued his analysis through the sequential evaluation process and considered all of Thomas's impairment-related limitations, both severe and non-severe, in determining his RFC, the failure to find Thomas's CHF to be a severe impairment would be harmless error at worst.  *See, McGlothin v. Comm'r of Soc. Sec.*, Case No. 07-4355, 2008 WL 4772077 at *6 (6th Cir. Oct. 31, 2008).  Because this is exactly what occurred – – the ALJ continued the sequential analysis to consider all of Thomas's physical limitations despite omitting his CHF diagnosis as step 2 – – the failure to include congestive heart failure among the severe impairments was at worst harmless error.[1]

---

[1] The Commissioner argues that while Thomas was indeed diagnosed in October 2012 with CHF, his medical records after that date contain little, if any, ongoing reference to CHF.  Indeed, the Commissioner points to the medical records of the Park Duvall health clinic in which CHF is listed in the category of "past medical" problems and no ongoing treatment plan is included to address CHF, unlike Thomas's atrial fibrillation and hypertension problems (TR 366, 390, 393, 464, 468, 471, 478, 501, 504, 507, 509).  While we do not disagree with the Commissioner in this respect, our conclusion that the failure to include CHF at step 2 of the sequential evaluation process is at most harmless error remains unchanged irrespective of these facts.

**Finding of Fact No. 4**

Thomas correctly maintains that ALJ Zuber failed to include any mention of CHF in his consideration of the Listing of Impairments in finding no. 4.  (TR 21) At most, the ALJ mentions chronic atrial fibrillation in relation to Listing 4.05 and hypertension in this section of his hearing decision.  He does not mention, much less discuss, Listing 4.02 for congestive heart failure.  At step three, a claimant will be considered to be disabled if his impairment meets or equals one of the listings of impairments found in 20 C.F.R. Part 404, Subpart P, App. 1.  *McClellan v. Astrue*, 804 F. Supp.2 d 678 (E.D. Tenn. 2011).

The burden rests with the claimant to prove every element of the applicable listing.  *King v. Sec'y of H&HS*, 742 F.2d 968, 974 (6th Cir. 1986).   When the claimant presents evidence of an impairment that meets or equals all of the requirements for a particular listed impairment, along with the 12-month duration requirement, a finding of disability is required without regard to the claimant's age, education or work history.  *Lankford v. Sullivan,* 942 F.2d 301, 306 (6th Cir. 1991); Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990). *See also, Sullivan v. Zebley*, 493 U.S. 521, 531-33 (1990) ("The Secretary [now Commissioner] explicitly has set the medical criteria defining the listing impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just 'substantial gainful activity.'") (citing 20 C.F.R. §416.925(a)(1989)); *Bowen v. City of New York*, 476 U.S. 467, 471 (1986) ("If a claimant's condition meets or equals the listed impairments, he is conclusively presumed to be disabled and entitled to benefits; if not, the process moves to the fourth step").

An impairment or combination of impairments will be deemed medically equivalent to a listed impairment if the symptoms, signs and laboratory findings demonstrated by

11

the medical evidence are equivalent in severity and duration to that of a listed impairment.  *See Land v. Sec'y of H&HS,* 814 F.2d 241, 245 (6th Cir. 1986) (citing 20 C.F.R. §1526(b)).  A decision of medical equivalency, however, must be based solely on medical evidence supported by acceptable clinical and diagnostic techniques.  *Id.*  Also, an ALJ is not required by Sixth Circuit case law to individually discuss each element of the record when considering the listings so long as the ALJ demonstrates that he has considered the totality of the record.  *Rosic v. Comm'r of Soc. Security,* 2010 WL 3292964 at *3 (N.D. Ohio Aug. 19, 2010) (citing *Gooch v. Sec'y of H&HS,* 833 F.2d 589, 591 (6th Cir. 1987)).

Because the listings establish a presumption of disability without consideration of a claimant's age, education or work experience, and represent an automatic "screening in" based only on a claimant's medical findings, the claimant must meet the strict evidentiary standard described above.  *Zebley*, 493 U.S. at 532.  Here, Thomas simply did not meet the criteria for Listing 4.02 as the Commissioner correctly points out in her Fact and Law Summary so that the failure of the ALJ to expressly discuss this Listing again was at most harmless error.  *White v. Colvin*, No 3:16-CV-00071-REB, 2017 WL 1947446 at *11 (D. Idaho May 10, 2017) (failure of ALJ to consider Listing 4.02 was harmless error where the record established that the claimant did not suffer the necessary symptoms as required by the Listing).

This exact issue, the failure to consider Listing 4.02 as being harmless error, was discussed by our sister district court for the Eastern District of Michigan in the *Dew v. Commissioner of Social Security*, 2017 WL 744238 at *1-2 (E.D. Mich. Feb. 27, 2017.)  In *Dew*, the district court adopted the recommendation of a magistrate judge, who held that the failure of the ALJ to evaluate Listing 4.02 was harmless error.  In doing so, the district court explained that

12

"[N]either the listings nor the Sixth Circuit require the ALJ to 'address every listing' or 'to discuss listings that the applicant clearly does not meet.' " *Smith-Johnson*, 579 Fed.Appx. at 432 (quoting *Sheeks v. Comm'r of Soc. Sec.*, 544 Fed.Appx. 639, 641 (6th Cir. 2013)). "The ALJ should discuss the relevant listing, however, where the record raises 'a substantial question as to whether [the claimant] could qualify as disabled' under a listing." *Id.* (quoting *Abbott v. Sullivan,* 905 F.2d 918, 925 (6th Cir. 1990)). However, "[a] claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he has satisfied a listing. Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.* "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433.As a result, Dew is only entitled to remand if she can point to specific evidence in the record demonstrating that she reasonably could meet or equal every requirement of Listing 4.02.

*Dew v. Comm'r of Soc. Sec.,* 2017 WL 744238, at *2. *See also, White v. Colvin*, No. 5:12–CV–03944–KOB, 2014 WL 1259725 at * 14 (N.D. Ala. Mar. 26, 2014)(same); *Dunn-Johnson v. Commissioner of Soc. Sec. Admin.,* No. 3:10–CV–1826–BF, 2012 WL 987534 at * 7-8 (N.D. Tex. Mar. 22, 2102)(same).

Because the claimant in *Dew* could not point to substantial evidence that she satisfied Part B of Listing 4.02, which required either persistent symptoms of heart failure, three or more episodes of acute congestive heart failure within 12 months or no ability to perform an exercise tolerance test at 5 METs, the district court rejected the claimant's objections based on its agreement with the magistrate judge that there was "insufficient evidence in the record to establish that Dew can meet each requirement of the listing." *Id*. at *4. In order to qualify as disabled under Listing 4.02, Thomas must show that he can satisfy the following requirements:

A. Medically documented presence of one of the following:

1. Systolic failure (see 4.00D1a(i)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or

2. Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);

AND

  B. Resulting in one of the following:

1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or

2. Three or more separate episodes of acute congestive heart failure within a consecutive 12–month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b(ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or

3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

a. Dyspnea, fatigue, palpitations, or chest discomfort; or
b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or

c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or

d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.
20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 4.02

*Dew,* 2017 WL 744238, at *2–3 (E.D. Mich. Feb. 27, 2017).

    Here, Thomas has failed to show that he satisfied the listing criteria of Part A of Listing

4.2.  Under the Part A criteria for systolic heart failure,[2] Listing 4.02 requires a claimant to show

"medically documented presence of systolic failure" along with "left ventricular end diastolic

_____

[2] Thomas does not claim diastolic failure of his heart under Listing 4.02(A)(2).

14

dimensions greater than 6.0 cm or an ejection fraction (EF) of 30% or less during a period of stability (not during an episode of acute heart failure)." 20 C.F.R., Part 404, Subpart P, App. 1, § 4.02(A)(1).

None of the echocardiograms taken of Thomas between November 2012 and March 2015 produced results that would satisfy the left ventricular in diastolic dimensions (LVID) and EF requirements of Part A of Listing 4.02. Thomas's echocardiogram of November 2012 revealed an LVID of 5.5 cm and EF of 38%. (TR 332). Two years later in March 2014, a second echocardiogram revealed an LVID of 4.6 cm and an EF of 42%. (TR 424-26). The following year in March 2015, a third echocardiogram revealed an LVID 4.24 cm and an EF of between 35-40%. (TR 550-51). A final fourth echocardiogram from March of 2015 showed an EF at 43% with a "normal" left ventricle chamber size. (TR 543-44).    In other words, none of the critical echocardiogram test results over a three-year time frame satisfied the criteria of Part A of Listing 4.02.[3] Consequently, the failure of ALJ Zuber to discuss Listing 4.02 was at worst harmless error. See, *Dew v. Comm'r of Soc. Sec.,* 2017 WL 744238, at *2; *White v. Colvin*, 2014 WL 1259725 at * 14; *Dunn-Johnson v. Commissioner of Soc. Sec. Admin.,* 2012 WL 987534 at * 7-8.[4]

**Finding of Fact No 5**

Thomas focuses primarily in this section of his Fact and Law Summary on the medical source statement of Dr. Cherian (TR 558-562) that was submitted by his prior counsel to the ALJ on June 15, 2015 following the administrative hearing held two weeks earlier on June 2 (TR 32-

---

[3] Further, Dr. Schwartz in his treatment notes of March 27, 2015 indicated that while Thomas did have some evidence of heart failure "it has been fairly mild." (TR 542).

[4] We likewise agree with the Commissioner that Thomas failed to show that he met all the criteria of Listing 4.05 for atrial fibrillation; however, because Thomas does not raise this argument in the body of his Fact and Law Summary, we decline to discuss this particular Listing any further than to say that Thomas failed to establish that he met all of the criteria for the Listing.

66).  Thomas argues that this source statement entirely contradicts the RFC determination of ALJ

Zuber in finding no 5 of the hearing decision that prior to May 1, 2015, Thomas could perform a

limited range of light work.

ALJ Zuber concluded in his decision that "medical evidence does not support the level of

limitation opined" by Dr. Cherian.  (TR 24).  He found that the extreme limitations imposed by

the doctor in his medical source statement could not be squared with the medical evidence of

record and the opinions of various examining and reviewing physicians.  (TR 24, 67-79, 97-109,

400-05).  Thomas's own repeated statements to various medical professionals that he was doing

well and did not have chest pain or breathing difficulties with exertion also were contrasted to

Dr. Cherian's opinion by ALJ Zuber.  (TR 22-23, 374, 384, 389, 393, 396-97, 409, 451-52).[5]

Dr Cherian in his medical source statement concluded that Thomas was precluded from

occasionally lifting 10 pounds or more and could frequently lift no weight whatsoever.  (TR

559).  The doctor limited Thomas from standing or walking to less than 2 hours in an 8-hour

workday due to dizziness and shortness of breath.  (Id.).  He likewise limited Thomas from

pushing or pulling with either the upper or the lower extremities due to pain or shortness of

breath.  (TR 560).  As support for these severe exertional limitations the doctor cited

echocardiogram test results that show an EF of 38% accompanied by moderate mitial

regurgitation, chronic atrial fibrillation, and shortness of breath, adding that if Thomas's "left

---

[5] For example, on August 12, 2014 the treatment notes for Thomas by Dr. Moise at the Park Duvall Community
Health Clinic reveal the reason for the visit to be a "recheck of congestive heart failure."  (TR 456).  The doctor's
treatment notes on that date immediately continue to reflect that "[CHF] symptoms do not include shortness of
breath, dyspnea on exertion or fatigue.  The patient describes this as improving."  (Id)

ventricle dysfunction worsened then [he would be a] candidate for ICD (Implantable Cardioverter Defibrillator) placement.[6]  (TR 560).

Dr. Cherian likewise precluded Thomas from virtually all postural activity such as climbing, kneeling, crouching, crawling or stooping based on his conclusion that "with any exertion patient is very short of breath, dizziness, very fatigued."  (Id).  The doctor also found Thomas to be limited in all manipulative functions to occasionally reaching, handling, fingering and feeling for the same reasons (TR 561).  Indeed, the doctor found Thomas to be limited in his seeing, hearing and speaking also due to weakness of the heart, chronic atrial fibrillation, fatigue and shortness of breath.

Under the treating physician rule, the Commissioner's regulations require that the ALJ will give a treating source's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record."  20 C.F.R. §§404.1527(d)(2), 416.927(d)(2).  *See, Cole v. Astrue*, 661 F.3d 931, 937-39 (6th Cir. 2011) (discussing the treating physician rule).  A physician will qualify as a treating source if the claimant sees the doctor "with a frequency consistent with accepted medical practice for the type of treatment/evaluation required for the medical condition."  *Smith v. Comm'r of Soc. Security*, 482 F.3d 873, 876 (6th Cir. 2007) (quoting 20 C.F.R. §404.1502).

The treating physician rule rests on the assumption that a medical professional who has dealt with a claimant over a long period of time for a specific illness will have a deeper insight

---

[6] " An implantable cardioverter defibrillator (ICD) is a small device that's placed in the chest or abdomen. Doctors use the device to help treat irregular heartbeats called arrhythmias (ah-RITH-me-ahs).An ICD uses electrical pulses or shocks to help control life-threatening arrhythmias, especially those that can cause sudden cardiac arrest (SCA). See https://www.nhlbi.nih.gov/health/health-topics/topics/icd (last visited July 17, 2017).

into the medical condition of the claimant than an individual who may have examined the claimant only once or has merely seen the medical records of the claimant. *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (citing *Bowman v. Heckler*, 70 F.2d 564, 568 (5th Cir. 1983)). The opinion of a treating source need not be given complete deference, however, if that opinion lacks objective support in the record, is in tension with a prior opinion of the same treating source, lacks meaningful detail, is entirely conclusory, or is in conflict with other evidence of record showing substantial improvement in the claimant's condition. *See, White v. Comm'r*, 572 F.3d 272, 285-87 (6th Cir. 2009); *Calvert v. Firstar Financial, Inc*., 409 F.3d 286, 294 (6th Cir. 2005); *Walters v. Comm'r*, 127 F.3d 525, 530 (6th Cir. 1997); *Cutlip v. Sec'y*, 25 F.3d 284 (6th Cir. 1994).

Even in those circumstances in which the Commissioner does not give the opinion of a treating physician controlling weight, it may still be given great weight. *White,* 572 F.3d at 286 (citing SSR 96-2p). When an ALJ declines to give controlling weight to the opinion of a treating source, the ALJ must balance a number of factors to evaluate what weight the opinion should be given. *Wilson,* 378 F.3d at 544. These factors include the length of the treatment relationship, frequency of examination, the nature and extent of the treatment provided, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Cole,* 661 F.3d at 937 (citing 20 C.F.R. §404.1527(d)(2)).

As to the importance of these factors when determining the weight to be given the opinion of a treating source, *Cole* explains:

> [T]he Commissioner imposes on its decision makers a clear duty to "always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion 20 C.F.R. §404.1527(d)(2). Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any

18

> subsequent reviewers the weight the adjudicator gave to the treating
> source's medical opinion and the reasons for that weight.  S.S.R. 96-2p
> (1996).  This requirement is not simply a formality; it is to safeguard the
> claimant's procedural rights.  It is intended 'to let claimant's understand
> the disposition of their cases, particularly in situations where a claimant
> knows that his physician has deemed him disabled and therefore might be
> especially bewildered when told by an administrative bureaucracy that ...
> he is not."  *Wilson,* 378 F.3d at 544.

*Cole,* 661 F.3d at 937-38.

When an ALJ fails to conduct a balancing of the above factors to determine the weight

that should be awarded to a treating source opinion, such as occurred in *Cole,* the Sixth Circuit

has made clear that it does not "hesitate to remand when the Commissioner has not provided

'good reasons' for the weight given to a treating physician's opinion and we will continue

remanding when we encounter opinions from ALJs that do not comprehensively set forth the

reasons for the weight assigned to a treating physician's opinion."  *Cole,* 661 F.3d at 939 (citing

*Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009) (quoting *Wilson,* 378 F.3d at 545)).

 As noted, ALJ Zuber gave the medical source opinion of Dr. Cherian little weight based

in part on his conclusion that "the medical evidence does not support the level of limitation

opined by the treating cardiologist."  (TR 24).  The ALJ noted that, while Thomas did

occasionally require cardioversion, "his cardiovascular examination has generally been normal."

(Id.).  Also cited by the ALJ are the opinions of the state agency non-examining physicians that

Thomas remained capable to perform light exertional work activity.  (Id.).

Here, the extraordinary physical limitations assessed by Dr. Cherian were properly

determined by the ALJ to be inconsistent with substantial evidence and not well-supported by

medically acceptable clinical and laboratory diagnostic techniques.  First, Dr. Cherian had no

regular, on-going treatment relationship with Thomas following his discharge from

19

hospitalization on November 5, 2012 until March of 2015.  (TR 327-29, 332).  At most, Dr.

Cherian prepared treatment notes during Thomas's hospitalization and read Thomas's

echocardiogram while Thomas was hospitalized that November.  The medical records reveal no

regular ongoing involvement by the doctor in Thomas's medical treatment again until March

2015, some 2-years and 4-months later, a mere 3-months before the May 1, 2015 date of

disability ultimately established by the ALJ's hearing decision.  (TR 26).

Second, as ALJ Zuber found, Dr. Cherian's extreme physical limitations simply cannot

be squared with the ongoing treatment notes of Dr. Moise at the Park Duvall Community Health

Clinic.  (TR 361-398, 406-410, 448-492, 493-511).  As noted, Thomas repeatedly told Dr. Moise

over a number of years that he did not have chest pain nor problems with breathing on exertion.

(TR 22-23, 374, 384, 389, 393, 396-97, 409, 451-52).  He also advised Dr. Schwartz as late as

March 27, 2015 that he "had no chest pains or chest tightness" and had "not had problems with

syncope or near syncope."  Indeed, Dr. Schwartz specifically noted that Thomas "reports that he

has been feeling well and doing well.  He reports no problems or restrictions in doing activities."

(TR 540).  Yet, as the Commissioner correctly notes, Dr. Cherian placed the most restrictive

limitations possible in virtually every category of the medical source statement form, including

limitations on Thomas's manipulative abilities, his sight and his hearing.

Nowhere in the medical records is there any support for such extraordinary manipulative

and visual limitations.  No treating physician, Dr. Cherian included, placed any heart-related

visual limitations on Thomas.  At most, Thomas was found on eye examination at the U of L eye

clinic on February 26, 2014 to have mild cataracts, which did not necessitate any immediate

treatment other than to update his current lens prescription (TR 415-417).  Likewise, no portion

of the medical records supports the type of manipulative limitations in fingering or handling

objects such as those assessed by Dr. Cherian in his medical source statement (TR 559-562). Consequently, the ALJ cannot be faulted for placing little weight on Dr. Cherian's medical source statement.[7]

The remaining arguments raised by Thomas concerning finding no. 5 do not merit an extensive discussion. For example, Thomas complains that the ALJ failed to take into consideration his long work history and his lack of substance abuse prior to his alleged onset date in evaluating Thomas's credibility. Thomas, however, nowhere in his Fact and Law Summary explains how such an omission renders the ALJ's credibility finding unsupported.

An administrative law judge properly may consider the credibility of a claimant when evaluating the claimant's subjective complaints, and the federal courts will accord "great deference to that credibility determination." *Warner v. Comm'r*, 375 F.3d 387, 392 (6th Cir. 2004). The findings of the ALJ in this regard are repeatedly held in the Sixth Circuit to be accorded great weight, and judicial deference will be given to the ability of the ALJ to observe the demeanor and credibility of the witnesses. *Walters v. Comm'r*, 127 F.2d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y*, 818 F.2d 461, 463 (6th Cir. 1987)). Yet, the ALJ is not accorded absolute deference. His or her assessment of a claimant's credibility must be supported by substantial evidence. *Beavers v. Sec'y,* 577 F.2d 383, 386-87 (6th Cir. 1978).

When the ALJ "finds contradictions among the medical reports, claimant's testimony and other evidence," the ALJ may properly discount the credibility of the claimant.

---

[7] The Court additionally observes in passing that even if the ALJ had placed substantial weight on this medical source statement by Dr. Cherian it still would not contradict the conclusion that Thomas, prior to May 1, 2015, remained capable of performing light exertional work, given that the medical source statement asks for an assessment of "what the individual *can still do* despite his/her impairments." In other words, the medical source statement is not per se a retrospective document, but instead is an assessment of a claimant's present physical abilities to perform work-related activities. Because the doctor completed his medical source statement on June 15, 2015 it does not automatically follow that it applies to all prior dates after the alleged onset date of March 30, 2011, absent some express indication to the contrary.

*Winning v. Comm'r*, 661 F. Supp.2d 807, 822 (N.D. Ohio 2009) (citing *Walters,* 127 F.3d 525, 531 (6th Cir. 1997)).  The ALJ, however, is not permitted to render a credibility determination based solely upon a hunch, or "intangible or intuitive notion about an individual's credibility." Id. (citing Rogers, 486 F.3d at 247) (citing SSR 96-7p)).  Under SSR 96-7p, the ALJ must in the hearing decision set forth specific reasons for the credibility determination sufficient to make clear to the claimant and subsequent reviewers the weight that the ALJ gave to the claimant's statements and the reasons for such weight.  *Winning*, 661 F. Supp.2d at 823.  A mere blanket assertion that a claimant is not believable will not be sufficient under SSR 96-7p.  *Id.* (citing *Rogers,* 486 F.3d at 248).

ALJ Zuber did not in his hearing decision make such a "blanket assertion" that Thomas was not believable.  Indeed, the ALJ credited Thomas's repeated, contemporaneous statements to his treating medical providers, particularly Dr. Moise at the Park Duvall Clinic, that he did not have chest pains nor breathing problems on exertion as contradicting the credibility of his subsequent disability hearing testimony concerning the extent of his physical limitations.  (TR 23).  Hence, the failure of the ALJ to specifically refer to Thomas's work history is not determinative and Thomas cites no published federal court decision to the contrary.  Likewise, Thomas does not explain how the failure of the ALJ to discuss the NYHA functional classification system rating assessed Thomas now requires that the hearing decision be set aside.[8]

This NYHA functional classification apparently was assessed by Dr. Shahab Ghafghazi on February 5, 2014 due to Thomas's complaints of shortness of breath (TR 422). Immediately

---

[8] The New Your Heart Association functional classification system is frequently used by doctors to classify heart patients according to the severity of their symptoms.  The NYHA classification system contains four categories: Class I, no limitation of physical activity; Class II, slight limitation of physical activity; Class III, marked limitation of physical activity; Class IV, unable to carry on any physical activity without discomfort. See https://www.heart.org/HEARTORG/Conditions/HeartFailure/AboutHeartFailure/Classes-of-Heart-Failure_UCM_306328_Article.jsp?appName=MobileApp (last visited July 17, 2017).

after assessing this functional classification, the doctor continues to add that Thomas "has no risk factors for CAD (coronary artery disease)….[and]…had a negative MPS(myocardial perfusion scan).[9] Further, the Class II/III NYHA classification assessed to Thomas indicates only somewhere between "slight limitation of physical activity" and "marked limitation of physical activity."  Dr. Ghafghazi gives no further indication in his treatment report of February 5, 2015 where Thomas's functional limitations fall.  Therefore, this single reference to the NYHA functional classification, without more, is not of itself compelling indication that the RFC determination of ALJ Zuber in finding of fact no. 5, or his credibility determination for that matter, is unsupported by substantial evidence particularly given Thomas's own repeated statements to Dr. Moise that he was not experiencing chest pains or breathing problems during the critical time period.

**Findings of Fact Nos 9, 10, 11 and 12**

Thomas in his Fact and Law Summary makes no new arguments related to findings of fact nos. 9, 10, 11 and 12 of the hearing decision.  Instead, he merely incorporates by reference his earlier arguments with respect to findings no 4 and 5, which the Court has already discussed in detail above.  Vocational Expert Robert Piper testified at the hearing that, based on Thomas's age, education, prior work and RFC, there remained alternative work at a light exertional level that he could perform such as hand packager, sorter and production assembler. (TR 26-29). Because this testimony of the vocational expert, and the findings of the ALJ in general, appear to the Court to be well supported by the record, and in accordance with controlling case law, federal

---

[9] "A myocardial perfusion scan is a type of nuclear medicine procedure. This means that a tiny amount of a radioactive substance, called a radionuclide (radiopharmaceutical or radioactive tracer), is used during the procedure to assist in the examination of the tissue under study. Specifically, the myocardial perfusion scan evaluates the heart's function and blood flow."
http://www.hopkinsmedicine.org/healthlibrary/test_procedures/cardiovascular/myocardial_perfusion_scan_stress_92,P07979/  (last visited July 18, 2017).

regulations and administrative rulings of the SSA, the Court shall affirm the decision of the Commissioner that Thomas was disabled as of May 1, 2015. *See Ealy v. Comm'r,* 594 F.3d 504, 512-13 (6th Cir. 2010) ("[s]ubstantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays the claimant's individual physical and mental impairments.' ") (citing *Varley v. Sec'y of HHS*, 820 F.3d 777, 779 (6th Cir. 1987)). The Court shall dismiss the complaint of the Plaintiff with prejudice by separate, final order.

Cc:     Counsel of Record